UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOSEPH MAZZEI, individually and on behalf of     :
the Fee-Split Class,                             :
                                                 :     Index No.:
                        Plaintiffs,              :
                                                 :
        - against -                              :
                                                 :
THE MONEY STORE, TMS MORTGAGE, INC.              :
and HOMEQ SERVICING INC., WELLS FARGO            :
BANK, N.A.,                                      :
                                                 :
                        Defendants.              :
                                                 :
-------------------------------------------------------------------x
JOSEPH MAZZEI, individually and on behalf of     :
individually and on behalf of the Fee-Split Class, :
                                                 :     Index No.:  01 Civ. 5694(JGK)
                        Plaintiffs,              :
                                                 :
        - against -                              :
                                                 :
THE MONEY STORE, TMS MORTGAGE, INC.              :
and HOMEQ SERVICING INC., WELLS FARGO            :
BANK, N.A.,                                      :
                                                 :
                        Defendants.              :
                                                 :
-------------------------------------------------------------------x

## COMPLAINT FOR RULE 60(B)(3) RELIEF OR
## RULE 37(B)((2) SANCTIONS

## Introduction

1.      Our judicial system generally relies on litigants to tell the

truth and participate in discovery in good faith.  A litigant's failure in these

duties, if significant enough, can result in circumstances which seriously

1

affect the integrity of the normal process of adjudication.  Such misconduct is especially damaging where it involves false representations about a party's ability to produce critical discovery which the court then relies upon in making its decisions.  As detailed below, Plaintiffs' Joseph Mazzei and the Fee-Split Class respectfully submit  – based on evidence uncovered in a related case – that the HomEq defendants, Wells Fargo and their attorneys engaged in fraudulent conduct in a successful effort to defy court-ordered disclosure of critical evidence in the Mazzei case.

2.      After many years of litigation, Mazzei and the Fee-Split Class brought their claims of illegal fee-splitting to trial in December 2014. A critical issue in the litigation was whether the defendants possessed, or had within their custody or control, evidence of payments made to non-attorneys on foreclosure and bankruptcy cases referred by Defendants (the "Fee-Split" or "Fidelity Payment" data).

3.      Earlier in the <u>Mazzei</u> Action, Defendants and their attorneys had repeatedly assured this Court and Plaintiffs' attorneys that the Fee-Split Data had been preserved.  However, after the Fee-Split Class was certified, defendants and their attorneys changed their story, now asserting that this evidence had, in fact, not been preserved, and could not be reproduced without extraordinary time and expense by Defendants.  The

Court relied on these misrepresentations, in both pretrial rulings and in its conduct of the trial. The absence of the Fee-Split Data was a critical factor in defendants' victory on the Fee-Split claim, allowing defendants to escape liability at trial and preserve this result on appeal.

4.  Now, however, Plaintiffs' counsel has learned that Defendants' representations about the Fee-Split Data made in the <u>Mazzei</u> Action were false. Thus, in the related <u>Bigsby</u> case – which involved evidence of fee-splitting identical to the materials sought in the <u>Mazzei</u> Action – Plaintiffs' counsel discovered that Fee-Split evidence was, in fact, available and easily accessible.

5.  Plaintiffs submit this complaint for sanctions under FRCP Rules 60 and 37. The longstanding fraud committed by Defendants and their attorneys greatly lengthened the litigation of the Mazzei Action, caused the needless expenditure of time, effort and funds by Plaintiffs' counsel, and fundamentally tainted the fair adjudication of this case. The circumstances fully justify serious sanctions.

## **THE PARTIES**

6.  Defendant The Money Store, Inc. ("Money Store Inc.") was, upon information and belief, a New Jersey corporation which had its principal place of business at 707 West 3rd Street, Sacramento, California

95605.

7.     Defendant TMS Mortgage, Inc. ("TMS") was, upon information and belief, a New Jersey corporation and subsidiary of The Money Store, Inc.   TMS was engaged in the business of originating, purchasing, selling and/or servicing consumer mortgage loans.   Its principal place of business was also 707 West 3rd Street, Sacramento, California 95605.

8.     Defendant HomEq Servicing Corp. was, upon information and belief, a New Jersey Corporation formerly known as the Money Store and/or TMS Mortgage, Inc. which acted as a servicer for mortgage loans.

9.     HomEq Servicing Corporation was the successor by merger to TMS Mortgage, Inc., and was a wholly-owned subsidiary of The Money Store Inc.   In 2000, TMS Mortgage, Inc. merged with and changed its name to HomEq Servicing Corporation.   Its principal place of business was located at 4837 Watt Avenue, North Highlands, California 95660.

10.     HomEq is currently owned by Defendant Wells Fargo Bank, N.A., the ultimate successor by merger to HomEq (the Defendants are collectively referred to herein as "HomEq").

## JURISDICTION AND VENUE

11.     The jurisdiction of the Court is invoked pursuant to Rule 60 of the Federal Rules of Civil Procedure, and under Rule 37 of the Federal Rules.

## FACTS

### I.  THE MAZZEI ACTION

12.     In or about February 2001, Mazzei instituted the Mazzei Action against HomEq.

13.     The lawsuit instituted by Mr. Mazzei in February 2001 was extraordinarily lengthy.  Judge John Sprizzo, the original federal judge assigned to the case, did not permit discovery on the state claims raised by Mazzei until 2006, and prohibited any class discovery until May of 2008, seven years after the institution of the lawsuit.

14.     Thereafter, Judge Sprizzo passed away, and the matter was assigned to this Court.

### A. Mazzei's Motion To Enjoin Defendant's Destruction Of Fee-Splitting Data

15.     In May 2009, after HomEq's Rule 30(b)(6) witness John Dunnery testified that HomEq purged its data systems annually of loans

which had been paid off or liquidated, Mr. Mazzei filed a motion seeking to enjoin HomEq from destroying any of the records in their databases. Mr. Mazzei's motion specifically described how the destruction of that data would affect the ability to show the allegedly improper fee-split between law firms and Fidelity National Foreclosure Solutions (hereinafter "Fidelity"), HomEq's principal outsourcer, should a class be ultimately certified:

> One of the principal claims for which the plaintiffs seek class certification involves the allegedly illegal sharing of attorneys' fees between HomEq Outsourcers like Fidelity and their local network attorneys. While HomEq has admitted *generally* that Fidelity and other Outsourcers retain a portion of the legal fee ultimately paid by borrowers, HomEq has failed to provide any documents showing the *actual* division of purported "legal fees" in the matters . . . which were referred to the Outsourcers.

(A-95)[1].

16.    In opposition to the motion, W. Hans Kobelt, one of the attorneys representing HomEq from Pollack & Kaminsky, submitted a declaration to the Court in which he represented the following "based on

---

[1] The reference "A" in this Complaint are to the appendix cites in the appeal of the Mazzei Action.  Mazzei v. Money Store, Inc., 15-2054 (2nd Cir. 2015).  The reference "ECF Doc. #_" is to the docket in the Mazzei Action.

my conversations with personnel of HomEq Servicing Corp.":

> The Money Store has assured defense counsel
> that it has, and has long had, a "litigation hold"
> directive in place as to these actions, and that The
> Money Store has not destroyed documents, or
> engaged in the conduct which plaintiffs' motion
> for an injunction and sanctions accuses them of.

(A-242).

17.    In response to the testimony from Mr. Dunnery about data

purging of certain records, Mr. Kobelt represented that:

> Mr. Dunnery explained that significant [] records
> are kept, but mistakenly said that some are not.
> Mr. Dunnery . . . was not in charge of record-
> retention, and has only limited knowledge of it.
> After [Dunnery's testimony], we again checked
> with HomEq and were advised again that all of
> the records are retained in either the IT Turbo
> system, the New Invoice system, or Oracle....

A-242.[2]

18.    Unbeknownst to Mr. Mazzei, the representations made by

_____

[2] HomEq repeated these same representations in (a) two memoranda of law filed with the Court on June 10 and 15, 2009, (see ECF Doc. #96, p. 5 n.1; ECF Doc. #99, p. 3 n.1 ("defense counsel has been advised by Defendants that, in actuality, all of the records *are* retained in either the IT Turbo system, the New Invoice system, or Oracle")) (emphasis in original); (b) a letter motion to the Court from defendants dated July 10, 2009 requesting that defendants be allowed to file a late Declaration from a Barclay executive Gregory Ekbom on the spoliation issue (ECF Doc. #102 ("as we have been assured, the evidence at issue has not been discarded or destroyed")), and (iii) the Ekbom Declaration filed with the Court on July 10, 2009. (Mazzei Doc. #103 ("the records relating to paid-off loans are, and have continued to be, retained in either HomEq's IT Turbo or Oracle databases")).

HomEq and its attorneys were completely inaccurate.  In fact, as Plaintiff would only later learn, counsel could not have consulted with personnel at HomEq or Money Store about these records because these companies had not operated the mortgage servicing business since at least November 2006, and had in fact been merged out of existence.  Nor did HomEq take any steps to preserve the information relating to the fees paid to Fidelity on litigation matters involving HomEq and borrowers.

19.     Nevertheless, based on these assurances, Mazzei withdrew the motion.

### B. Certification Of The Fee-Split Class

20.     In 2012, Mr. Mazzei moved for class certification.

21.     In opposition to the motion, HomEq filed papers in April 2012 which said that class certification should be denied because it would require an individualized "review of the Fidelity invoices" on the New Invoice System (Dunnery Decl., ECF Doc. #162, pp. 13-14).  However, Defendants representations regarding the analysis of the New Invoice System that would be required was fraudulent because – as their in-house counsel would later reveal – HomEq knew that the New Invoice System was no longer in their possession at that point, and had indeed been "dismantled" several years earlier.  (See infra ¶ 59).

22.     In December 2012, this Court granted certification of two nationwide classes in <u>Mazzei</u>, including a class of all borrowers who Defendants charged for legal fees which included amounts paid to its outsourcer Fidelity.  (A-838, A-899).

23.     Following certification of the fee-split class, this Court directed the parties to meet to discuss identifying the Fee-Split Class members by using HomEq's databases.   ECF Doc. #187 (Ordering the parties to meet and confer on protocol to identifying the membership of the classes, and include representatives from HomEq "with most relevant knowledge of the computer systems and databases from which the membership of the certified Classes may be readily ascertained.").

24.     At this point, the Defendants were represented by the law firm of McCarter & English (hereinafter "M&E").

### C. HomEq Advises The Class And Court That It Does Not Have The Fee-Split Data

25.     In early February 2013, the Fee-Split Class served a document request on HomEq seeking, among other things, the information which Defendant and its attorneys had specifically represented was preserved in response to the 2009 motion to enjoin.   Thus, Request #5 sought the following:

> Documents concerning any payments received by

> Fidelity in connection with loans referred by Defendants to Fidelity during the Class period including, without limitation, any 'technology and referral fees', 'administrative support fee', 'outsource management fees' or similar fees related to services rendered by legal service providers.

(A-1379-1385).[3]

26.     At a subsequent meeting with counsel for the Fee Split Class in February 2013, HomEq and M&E revealed for the first time that the mortgage servicing operation had been sold, and that HomEq no longer had possession of its databases or any of the data which was contained therein.   HomEq and M&E advised counsel for Mr. Mazzei and the Classes that the loan information was now in the possession of the accounting firm Ernst & Young ("E&Y").

27.     On February 28, 2013, the Court held a hearing regarding HomEq's Databases.  At the hearing, HomEq produced Mark Buechner, Assistant General Counsel of Wells Fargo (the entity which now owned HomEq) to describe how E&Y came to possess the HomEq data. According to Buechner, HomEq relinquished control of the Databases when defendants purportedly sold HomEq to Barclays Real Estate Capital d/b/a HomEq Servicing (hereinafter "Barclays") in November 2006.   In

---

[3] On March 13, 2013, Defendants objected to the request, but stated that they were "continuing to search for any further information."

2010, Beuchner said he learned "after the fact" that Barclays sold the business to Ocwen Loan Servicing, LLC (hereinafter "Ocwen"), which was closing HomEq's operations.  As Beuchner stated, "[w]hen I learned of that transaction, I became very concerned … [about] preserv[ing] records so that we could retake possession."  (ECF Doc. #197 at 14).[4] Accordingly, Buechner hired E&Y to make a copy of the loan data (hereinafter the "E&Y Database").  (ECF Doc. #197, at 14-15).

28.    At the February 28, 2013 hearing, Dan Pollock, a partner at M&E and counsel for the defendants, told this Court the following concerning the Fidelity Payment Data:

> The second class, which is the fee split class, has been a total and impossible task to fulfill, and the reason is that the loan servicing histories, which are the Rosetta Stone of this information . . . neither does nor ever did contain information on what Fidelity did with law firms.  We have no information on whether any fees were split; if so, with whom or in what amounts.  That is not information that was captured on the databases .. . So it's not that we don't want to provide the information; it's that we don't have it.
> We actually have sought out Fidelity. . . We have been unable to get any information from Fidelity on what fees, what firms, or anything to date.  They – this is in the rearview mirror, apparently, of Fidelity. . . .

---

[4] The reference "Doc." is to the Docket in the <u>Mazzei</u> lawsuit.

(ECF Doc. #197).

29.    At the conclusion of the hearing, the Court stated

"I want the defendants to make whatever efforts can be made in terms of reasonably producing the documents that the experts could reasonably use."

(A-1278).

### D. The First And Second Court Orders Directing Defendants To Supply The Relevant Data

30.    On March 3, 2013, the Court entered an order directing the Defendants to produce "any records of payments to Fidelity by borrowers and HomEq."  (ECF Doc. #193).

31.    On March 11, 2013, the Court entered a second Order

The parties should make available any documents reasonably necessary to identify the two classes and enter into any necessary confidentiality order. The Court declines to specify those documents because the Court does not want to specify documents that may or may not exist and that may or may not be able to be produced in a timely fashion.  On the other hand, if documents are reasonably requested and not produced, then the parties will have to explain why they have not produced them.  (ECF Doc. #199).

### E. The Fee-Split Class's Efforts To Obtain The Fee-Split Data From Other Sources

32.    Following HomEq's disclosure that its Databases had not been preserved, counsel for Mr. Mazzei and the Fee-Split Class made

multiple attempts to determine whether the Fidelity Payment Data was contained in another existing database.   Thus, the Fee-Split Class subpoenaed both Barclays and Ocwen, the successors to HomEq's servicing operation, who each responded that they had no information relating to payments to Fidelity on loans serviced by HomEq which went into foreclosure or bankruptcy.

33.  The Fee-Split Class also issued subpoenas to Fidelity and each of its successors in an effort to obtain the data on payments to Fidelity. Among other documents, the subpoenas demanded:

> "Documents identifying all 'technology and referral fee', 'administrative support fee' or 'outsource management fee" payments received by Fidelity from The Money Store Defendants, HomEq or legal service providers. . . ."

See FNF Subpoena, Exh. 1 to ECF Doc. #195, Requests 3-7).

34.  Among the Fidelity entities subpoenaed, only Lender Processing Services (hereinafter "LPS") – one of Fidelity's successors – professed to have any responsive information.  After months of negotiations over the subpeona, LPS (through their attorney Fred Goldberg of the law firm Berger & Singerman) advised plaintiffs by letter dated September 13, 2013 that LPS had information in an electronic format for "what may be approximately 300,000 [HomEq] loans", including "invoices from law

firms to HomEq and billing records regarding services provided to the law firms by Fidelity." (ECF Doc. #219, Ex. B).  However, LPS stated that the information was inaccessible, and that it did not know whether the information could be "converted to a readable format."  LPS said that the search could take "hours to extract readable information" for each of the 300,000 HomEq loans and cost tens of millions of dollars to retrieve, for which LPS refused to pay (Id.).

35.  Counsel for Mr. Mazzei and Fee-Split Class provided this information to HomEq, who said they would not pay to retrieve the data. ECF Doc. #219, Ex. C (Email from HomEq's attorney stating that "I do not believe that [Wells Fargo] will have any appetite to fund a Fidelity search for invoices.").  HomEq's attitude toward the missing data was typified by a remark HomEq's counsel at M&E made to the Court at a June 2014 hearing:

> It was not our burden to go after Fidelity.  As it happens, we sought information from Fidelity, and they have chosen not to give it to us.  Your Honor has been party to and aware of the disputes between Mr. Goldberg down in Florida [counsel to LPS] and Mr. Grobman [Plaintiffs' counsel] in New York about the New Invoice System and who is going to pay and who is going to get what and how difficult it is to translate. We have been bystanders to that event.  If they get it, fine.  If they don't get it, fine.  I don't think that the case is going to turn on that.

(A-1016).

### F. The Fee-Split Class Moves To Compel HomEq To Provide The Fee-Split Data

36..  With the parties at an impasse, in October 2013, counsel for Mr. Mazzei and the Fee-Split Class moved for an order compelling HomEq "to determine whether the fee-splitting data can be retrieved from LPS and to produce that data."  (A-1108).

37.  On November 25, 2013, M&E filed opposition papers to the Fee-Split Class's motion on behalf of HomEq.  In the letter-opposition, M&E related information purportedly obtained from John Dunnery, a former HomEq executive who – according to M&E – was "the only person we know … who has personal knowledge of the New Invoice system." (Nov. 25, 2013 letter).  Among the representations made by M&E to the Court with regard to New Invoice were the following:

- "No part of New Invoice was housed on HomEq systems and the data fields or data entries could not be downloaded to HomEq systems."

- "There was no 'download' feature which would have allowed HomEq to export the data on the New Invoice system to a HomEq system."

- "Nor did Mr. Kobelt ever say or imply that there was any information on 'fee-splitting' in the New Invoice system.  In fact we are unaware of <u>any</u> information on 'fee-splitting' and … we have no reason to believe that any

> such information <u>ever</u> existed on the web-
> based portal which HomEq was granted access
> to by Fidelity until November 2006."
> (emphasis in original).[5]

38.   As a result of the above, Defendants attorneys wrote that there is no basis "for compelling Defendants to pay any charges, much less *the extraordinary charges* that LPS has stated will be involved in any possible recovery effort."  (Nov. 25, 2013 letter (emphasis added)).

39. As the Fee Split Class would later learn, each of the above representations were false or fraudulent.  In fact, much of the relevant information relating to fee-splitting had been readily accessible to HomEq on New Invoice and other databases.  Moreover, far from necessitating "extraordinary" expenditures, an accounting of both Administrative Fees and Technology Fees paid to Fidelity in connection with loans serviced by HomEq was readily-available to Defendants, requiring only that it request that information from Fidelity.

---

[5] M&E also said the following with regard to attorney Hans Kobelt's prior representations to the court in response to the motion to enjoin in 2009: "Mr. Kobelt never said or implied [in opposition to the 2009 motion to enjoin] that the Defendants had access to the New Invoice system in 2009 (which they did not after the sale of the assets to Barclays in 2006), but rather that he was advised by HomEq that whatever was in the New Invoice system had been preserved.  The keeper and owner of that system was Fidelity (now LPS), not the Defendants."

### G. Defendants Are Ordered To Provide The Fee-Split Information

40. On July 18, 2014, Magistrate Judge Ronald Ellis granted the Fee-Split Class's spoliation motion.   Judge Ellis's Order found that "defendants had both the legal right and practical ability to obtain the information relating to fees in the New Invoice System...." Mazzei v. Money Store, 2014 U.S. Dist Lexis 99850 (S.D.N.Y. 2014).  In addition, the Magistrate Judge ruled that HomEq was grossly negligent and acted "willfully" in failing to preserve the fee-splitting data:

> In the [2009] motion, Plaintiffs made clear that they were seeking to enjoin the destruction of fee-related records either in the possession of Defendants or Fidelity, stating 'HomEq has failed to provide any documents showing the *actual* division of purported legal fees' in the matters involving the plaintiffs … Even if HomEq did not itself have these documents in its possession, it clearly had the ability to direct Fidelity … to disclose the actual division of legal fees in these matters.'

> In their response ... Defendants stated that they have 'not destroyed documents," and that they have "long had, a litigation hold' directive in place as to these actions" .... Defendants further stated that … 'all of the records are retained in either the IT Turbo system, the New Invoice System, or Oracle…'

> Defendants were thus put on notice of the Plaintiffs' intent to seek fee-related data in the possession of Fidelity, and their response affirms

> that the data in the New Invoice System was
> being retained.
>
> Now, Defendants have informed Plaintiffs that
> the data in the New Invoice System is lost ...
> Thus, Defendants have failed to preserve the data
> after being put on notice that Plaintiffs intended
> it to be preserved, and after having affirmed that
> the data was being preserved.

Id. at *18-19.

41.   The Magistrate Judge also rejected the Defendants' argument that sanctions were inappropriate because Defendants told the Court in 2009 only that the data was being generally "preserved," not that it was being preserved by HomEq:

> The attempt to shift the responsibility and blame
> to Fidelity is unavailing.   The duty to preserve
> belongs to Defendants.   They had the ability to
> preserve the information through Fidelity.   They
> failed in that duty.

Id. at *22.

42.   Judge Ellis found that "the fee-related information in the New Invoice System has been destroyed in that it may no longer be accessible at all, and if it is accessible, will only be accessible at great cost."  Id. at *9.

43..   The Magistrate Judge agreed that Defendants should "obtain the information from LPS as a sanction for their failure to preserve the information in its original format," and ordered Defendants to "bear the costs of determining whether the New Invoice System Data currently in the

possession of LPS is searchable." Id. at *3, *25.

### H. HomEq And Its Attorneys Continue To Falsely Represent That The Fee Split Data Is Not Retrievable

44.   On August 1, 2014, M&E filed objections to the Magistrate's Opinion requiring HomEq to take steps to determine whether the Fee-Split Data in the possession of LPS could be retrieved (hereinafter the "Discovery Order Objections"). (A-1080-1097). In their Discovery Order Objections, HomEq and M&E represented that:

- "defendant never had access to information on the alleged splitting of any fees" (A-1084);

- "Fidelity did not give The Money Store access to th[e] information" on Fidelity's "fee arrangements with the law firms it retained." (A-1092);

- "defendants had no 'practical ability' to obtain the alleged fee-split information at Fidelity (or LPS)." (Id.).

45.   As the Fee-Split Class would later learn, HomEq's representations that it had no access to the Fee-Split Data and "no practical ability to obtain" that data from Fidelity was false. In fact, an accounting of both Administrative Fees and Technology Fees paid to Fidelity was readily-available to HomEq and involved little if any expense, requiring

only that it take steps to request that information from Fidelity.[6]

46.   HomEq filed objections to the Magistrate's Order, but took no steps to determine whether the fee-sharing data could be retrieved from LPS.  With a Court-ordered trial-ready date of October 10, 2014 looming, counsel for Mr. Mazzei and the Fee-Split Class filed a motion in September 2014 seeking a range of evidentiary trial sanctions for HomEq's spoliation, including: (i) an adverse inference instruction on spoliation; or (ii) precluding Defendants from presenting evidence on fee-splitting.  (A-1228).

47. On September 3, 2014, Dan Pollack, lead counsel at M&E for HomEq, appeared on HomEq's behalf in connection with the spoliation motions.  During the argument, Mr. Pollack said that the New Invoice data exists in "raw data" and a "very complex format."  (ECF Doc. #329, p. 20).

48.   As the Fee Class would later learn, the representation that the Fee-Split Data existed in a "very complex format" and was inaccessible was false.

49.   Mr. Pollack also represented:

---

[6] Defendants' Discovery Order Objections also represented that "[t]he New Invoice system did not show the information on the payment of legal fees." (A-1094).  This was also false.  (See ¶110, infra).

- that "there was a litigation hold" on the data sought by Mr. Mazzei in 2009.  (Id. at p. 24);

- that HomEq never had possession or control of data on New Invoice, but rather "only the opportunity to see it on the screen while we were a licensee."  (Id. at 20-21);

- that Defendants "tried for a long time to get Fidelity to produce information.  We were not successful… [W]e made every effort."  (p. 29);

- "[T]here's not going to be information in the New Invoice data system about fee splitting between the lawyers and the outsourcer."  (p. 29).

50.  As the Fee Split Class would later learn, each of the above representations was false and fraudulent.  In fact:

a) information relating to fee-splitting, including payments to Fidelity, was readily-available on New Invoice and other databases available to HomEq;

b) a detailed accounting of both Administrative Fees and Technology Fees paid to Fidelity in connection with loans serviced by the Defendants could be easily retrieved by Fidelity and/or its successors; and

c) the relevant information was at all times fully downloadable.

51.  On September 10, 2014, HomEq filed papers in opposition to the Fee-Split Class's motion for trial sanctions, including five affidavits making new representations about the databases and the condition of the

relevant information.

52. According to an affidavit from Chris Hymer, a former LPS executive, filed by HomEq on September 10, 2014

- "Records of bills submitted to law firms or payments made by law firms for technology or administrative services fees were never maintained on NewInvoice."

- "Records of bills submitted to law firms or payments made by law firms for technology or administrative services fees are maintained on a separate internal computer system."

- "At no time did loan servicers, such as TMS Mortgage or HomEq have access to the internal computer system referred to [above]."

(ECF Doc. #304).

53. As the Fee-Split Class would later learn, the representations made by Mr. Hymer in the affidavit filed by HomEq were false and/or fraudulent. In fact, information relating to Fidelity's assessment of Technology and Administrative Fees and the payment of such fees were readily available on New Invoice and/or one of the other suite of database systems provided to HomEq by Fidelity, and could in any event be accessed by HomEq in September 2014 simply by requesting the data from Fidelity. (See ¶¶ 101-108 infra).

54. Defendant also filed an affidavit from former HomEq executive

John Dunnery on September 10, 2014 which, *inter alia*, stated the following:

- "No part of New Invoice was housed on The Money Store systems and the data fields or data entries could not be downloaded to The Money Store systems."  (Par. 4).

- "Nor did the New Invoice system contain records of payments by The Money Store to vendors such as Fidelity . . . The New Invoice system simply helped The Money Store keep track of and review invoices from vendors, but it did not record payments of those invoices."

- "The New Invoice system also did not contain records of payments … by law firms to Fidelity."

- "At no time, during my employment at The Money Store did I or, to the best of my knowledge, anyone else at The Money Store have access to any records of payments made by … law firms to Fidelity."

(ECF Doc. #306).

55.    As the Fee Split Class would later learn, the representations made by Mr. Dunnery were false and/or fraudulent.  In fact:

a) the information in the data fields in New Invoice was fully downloadable;

b) New Invoice did record HomEq's payment of invoices submitted by Fidelity and lawyers;

c) Even if not on New Invoice, information relating to payments of Administrative Fees and Technology Fees to Fidelity in connection with loans serviced by HomEq was

readily-available as of the submission of Dunnery's affidavit.

56.    Defendants also filed an affidavit with the Court from Mark Buechner, Senior Company Counsel at Wells Fargo, on September 10, 2014, who indicated that he had managed the Mazzei case as in-house counsel since the filing of the Mazzei Action in 2001. (ECF Doc. #305). In his Declaration, Buechner represented that it was his responsibility to initiate litigation holds on records required or pending litigation, and that he initiated holds on HomEq's MSP and IT Turbo systems.

57.    Buechner's Declaration also stated that, in response to Mr. Mazzei's spoliation motion in 2009, he looked into "the nature of the New Invoice system and whether the New Invoice system was in use and was available for retrieval of data if necessary." According to Buechner:

> I learned that … access to Fidelity's New Invoice system was granted to Barclays and prior thereto to The Money Store on a limited basis via a computer portal controlled by Fidelity. The Barclays employees (and the Money Store employees prior to November 2006) using the New Invoice system could see but not download data on a Fidelity portal . . .

58. As the Fee Class would later learn, attorney Buechner's representations regarding access to New Invoice and the ability to download data on the system were false. In fact, the information in the

data fields in New Invoice was fully downloadable.[7]

59.    In his Affidavit, attorney Buechner also testified about when
HomEq first learned about the destruction of its' Databases:

> In 2010, Barclay's attorneys, not having given
> me any prior notice, advised me that they had
> completed a transaction to sell HomEq to Ocwen
> Financial Services.  I was advised that Barclays'
> access to New Invoice data was severed at or
> prior to the Ocwen transaction and that Fidelity
> had taken steps to dismantle the New Invoice
> system to non-operational status, although it has
> represented to this Court that the data that the
> system contained is still in existence.  I am
> informed that to utilize the data, either the
> original New Invoice system would have to be
> resurrected or new software would have to be
> designed to read the data.

(ECF Doc. #305).

60.  As the Fee Split Class would later learn, Buechner's
representations regarding the need to "design new software" or "resurrect"
the New Invoice system to obtain data concerning the Administrative Fees
and Technology Fees paid to Fidelity was false.   In fact, a detailed
accounting of both Administrative Fees and Technology Fees paid to
Fidelity was readily-available to HomEq in September 2014, requiring

---

[7] Indeed, if (as Buechner represented), neither HomEq nor its servicing
successors like Barclays could ever download data on the Fidelity portal,
then Buechner and HomEq's representations that there was any type of
litigation hold on the data was false.

only that HomEq take the steps ordered by the Court to seek that information from Fidelity.

61.    Defendants also submitted a Memo of Law in Opposition to the Motion for Trial Sanctions, signed by M&E, which stated the following:

- "[I]nformation from the New Invoice system is retrievable, although a complex task to do so." (p. 5).

- Fidelity has been "resistive to any effort by Defendants to obtain information on the New Invoice system. . ." (p. 8).

(ECF Doc. #303).

62.    As the Fee-Split Class would later learn, these representations in Defendants' memo of law were false and/or fraudulent.  Thus, far from a "complex task", information relating to payments of Administrative Fees and Technology Fees to Fidelity in connection with loans serviced by the HomEq was readily-available to Defendant as of September 2014, requiring only that HomEq demand such information from Fidelity.

63.    On October 1, 2014, M&E filed motion papers on HomEq's behalf in support of Defendants' motions in limine which represented that "records of bills submitted to law firms or payments made by law firms for technology or administrative services fees were never maintained on New

Invoice." (ECF Doc. #360, p. 20). Unbeknownst to the Fee-Split Class, this representation to the Court and the Class was fraudulent, because it created the false impression that this data was not available to HomEq and could not be provided by the Fidelity successor entities if requested.

## I.     The Court Relies On HomEq's Misrepresentations in Denying Trial Sanctions

64.     On November 24, 2014, the Court affirmed the Magistrate Judge's spoliation findings. The Court found that the information which HomEq failed to preserve was relevant to the claims made by the Fee-Split Class, and was "part of the evidentiary chain and will be subject to possible use at trial." A-2538; ECF Doc. #436. The Court also found that HomEq acted "willfully" and with "gross negligence" in failing to preserve the Fidelity Payment Data, relying on the prior representations made by HomEq and their attorneys in response to the 2009 Sanctions Motion:

> The defendants responded to that motion with a declaration [which represented] … that the defendants had a "litigation hold" in place and that no documents had been destroyed. . . .
>
> ***
>
> The plain import of this declaration was that the defendants were providing assurance that records were being retained in among other places the New Invoice system. It would have been irresponsible having made this representation not to have assured that the records were being maintained or to provide notice that the

> defendants did not in fact have any ability to
> assure that the records would be maintained in
> their current state so that they could be accessed.

(A-2537-38).

65.   However, the Court found that Mr. Mazzei and the Fee-Split Class were not entitled to any evidentiary remedy at trial.  The Court found that additional sanctions were not appropriate because – while HomEq's conduct was "grossly negligent" and "willful" — Defendants did not intentionally destroy the Fidelity Payment Data.  A-2574 ("there is no evidence of the defendants' bad faith in the sense that the defendants were intentionally depriving the plaintiff of information for use in this litigation.").

66.   Moreover, relying on the representations made by HomEq and its attorneys, the Court found that the fee-split information was not available on New Invoice, but rather on other purportedly now-inaccessible databases.  Thus, the Court found the following:

- "the New Invoice System continues to exist but it is currently difficult to access."  (A-2545).

- New Invoice "does not contain records of bills submitted to law firms or payments made by the law firms for technology or administrative services fees.  Those records are maintained on a separate internal computer system to which the defendants did not have access."  (A-2545).

- New Invoice "did not record the payment of Fidelity invoices by the defendants and it did not record the fees that were in turn charged to members of the class. Those items should have been recorded in other databases" which Plaintiffs purportedly did not seek. (A-2546; see also A-2619 line 8 ).

- New Invoice "would not have reflected the actual payments to Fidelity or the lawyers." (A-2549).

67.    As was subsequently revealed by the discovery conducted in the <u>Bigsby</u> Action, the representations relied upon by the Court were false and fraudulent.

68. The Court concluded that, since New Invoice purportedly did not contain information on fees paid to Fidelity, additional sanctions were inappropriate. (A-2546). For the same reason, the Court also concluded that the Fee-Split Class could not refer to the Court's findings that Defendants had willfully failed to preserve evidence during trial. (A-2603).

69.    The Court made other trial-related findings on November 24, 2019 in reliance on the misrepresentations made by HomEq and its attorneys. Thus, in denying the Fee-Split Class's motion to preclude HomEq from questioning expert Richard Holowczak about whether the Ocwen database contained evidence of fee-splitting, the Court found that

while the New Invoice system contained invoices sent by Fidelity and law firms to the defendant, "it did not contain the records of receipts by Fidelity or charges to borrowers, and it was not the reccords of the individual loans. …." (A-2576).

> **J.**   **The Court Again Orders HomEq To Take Steps To Determine Whether Data Relating To Payments To Fidelity Is Retrievable**

70.   At the same pretrial hearing on November 24, 2014, the Court again reiterated that – pursuant to the Magistrate's July 18th Order – HomEq was required to "bear the cost of determining whether" the Fee-Split data "in the possession of LPS is searchable" and could be retrieved:

> The magistrate judge made a ruling.  It was not stayed.  The defendant should promptly comply with that.  They should have complied with that. It wasn't stayed.

(A-2626).

71.   The <u>Mazzei</u> record provides no indication that HomEq or its attorneys took any steps to comply with the Court's November 24, 2014 Order.

> **K.**   **The Centrality Of The Absence Of Payment Data At Trial**

72.   On December 8, 2014, a two-week trial began on Mazzei's and the two class claims against HomEq.  Because the Fee-Split Data had not

been preserved by HomEq and purportedly could not be retrieved, neither Mr. Mazzei nor the Fee-Split Class were able to introduce direct evidence showing: (a) the fee-split between Fidelity and attorneys; (b) the payment of Administrative Fees or Technology Fees to Fidelity; or (c) HomEq's passing on of Administrative Fees to members of the Fee-Split Class.

73.    Moreover, because the Court ruled that Mr. Mazzei and the Fee-Split Class could not even refer to the Court's spoliation findings or introduce evidence relating to the missing data, Mr. Mazzei and the Fee-Split Class had no way to explain the failure to present this critical evidence to the jury.

74.    HomEq and its attorneys took full advantage of the Court's refusal to allow the class to raise what even the Court recognized was HomEq's willful spoliation of its databases, repeatedly emphasizing the absence of any direct proof of payments by lawyers to Fidelity.  (A-2755:1-7;   A-3066:21-A-3067:11;   A-4063:1-A-4064:7;   A-4155:6-A-4116:25; A-4117:15-A-4121:13; A-4124:5-4125:19).

75.    In his summation, HomEq' counsel focused on the lack of direct evidence of payments to Fidelity:

> What is the documentary evidence of fee splitting?  Well, plaintiff will point to the network agreements in this case, but those do not contain proof of payment; they merely set forth

the services that Fidelity will provide for the lawyers and the charges the lawyers will pay for those services.

****

Plaintiff has not put before you any checks or wires from law firms to Fidelity.  There is a failure of proof of this claim because there is a failure to prove monies going to Fidelity.  And that's what fee splitting is based on.

(A-4336:2-7; A-4336:12-15; A-4331:1-4; A-4330:14-17) (arguing that the absence of evidence of "actual payments being made by the lawyers to Fidelity" is "a critical point in this case").

76.   HomEq and its attorneys also made representations regarding the absence of proof of payments to Fidelity in numerous papers filed with the Court.  See Defendants' Motion for Judgment, ECF Doc. #450, p. 15 ("Nor did Plaintiff introduce any [] evidence to demonstrate that any fees were in fact 'split' between Fidelity and the law firms"); Defendants' Reply Memo, ECF Doc. #455, dated Dec. 14, 2014, p. 5 ("the Network Agreements are not themselves proof of any fees being paid by a law firm to Fidelity... [T]he presence of fee schedules in those agreements does not prove that any such fees were actually paid."); ECF Doc. #498, p. 5 (plaintiffs failed to present "proof of any payments to Fidelity by lawyers" at trial).

**L.  The Jury Verdict**

77.    On  December  18,  2014,  following  denial  of  the  HomEq's

second motion for judgment or to decertify the classes, the Court presented

the Fee-Split Claims to the jury.  (A-4316:5-9).

78.    On  December  19,  2014,  the  jury  found  that  neither  Mr.

Mazzei  nor  the  Fee-Split  Class  had  proven  that  the  Defendants  breached

the  loan  documents  by  charging  legal  fees  which  were  divided  between

Fidelity and law firms.  (A-5331).

**M.  The Post-Trial Motions And Decisions**

79.    Thereafter, both sides made post-trial motions.  The Fee-Split

Class moved for a new trial under Rule 59, arguing that the Court's refusal

to  grant  any  trial  remedies  for  HomEq's  failure  to  preserve  fee-splitting

evidence—or  to  permit  Mr.  Mazzei  and  the  Class  to  present  evidence  of

spoliation  to  the  jury—was  a  substantial  error,  particularly  when  coupled

with  HomEq's  repeated  arguments  that  there  was  no  evidence  of  payments

by lawyers to Fidelity.

80.    In  opposition  to  the  motion,  HomEq  and  its  attorneys  filed

papers on February 20, 2015 which made the following representations in

arguing that the jury's verdict should be upheld:

- "the  New  Invoice  system  would  not  have

reflected the actual payments to Fidelity or the lawyers… (Id. at 16).

- the NewInvoice system "did not contain 'direct evidence'" of "payments to Fidelity";

(ECF Doc. #498).

81.    As the Fee Class would later learn through discovery in <u>Bigsby</u>, these representations were false and/or fraudulent.   In fact, the New Invoice system would have reflected "the actual payments to Fidelity", including evidence showing the payment of Administrative Fees represented to Fee-Split Class Members as "attorney's fees."   See infra at ¶¶101-103, 105-110.

82.    Moreover, HomEq and its attorneys also made the following additional representations in their opposition papers:

- the New Invoice System did "not contain records of bills submitted to law firms or payments made by the law firms for technology or administrative services fees"; (ECF Doc. #498, at p. 23).

- "the New Invoice system did not record payments to Fidelity by lawyers, as Defendants consistently demonstrated to the Court over the past six months"; (Id. at p. 5, n.2).

83.    Unbeknownst to the Fee-Split Class, these representations were also fraudulent, because they created the false impression that the Fee-Split

Data was not available to HomEq in September 2014, and could not have been provided by Fidelity and/or its successors if HomEq had simply complied with the Court's numerous orders to produce that information.

84.  By Order dated May 29, 2015, the Court denied the motion for a new trial on the Fee-Split Claim.  In finding that the jury did not abuse its discretion in rejecting Mazzei's individual claim and the claim made by the Fee-Split Class, the Court made the following findings about the absence of any direct evidence of payments to Fidelity:

> The plaintiff presented no direct evidence of payments from attorneys to Fidelity.  When calculating the amount of attorney's fees that were allegedly shared with Fidelity, the plaintiffs relied on percentages specified in various 'network agreements" between Fidelity and law firms.
>
> *    *    *    *
>
> [T]he jury could have found that, based on the lack of evidence of payments to Fidelity by attorneys, the plaintiff did not satisfy his burden to show fee splitting . . .

Mazzei v. Money Store, 308 F.R.D. 92, 103-104 (S.D.N.Y. 2015).

85.  In rejecting the claim that a new trial was warranted because HomEq's failure to preserve the fee-splitting evidence prevented the Fee-Split Class from showing payments to Fidelity, the Court relied upon the representations made by HomEq and its attorneys in making the following factual findings:

35

- "additional sanctions were inappropriate because the New Invoice System would not have shown actual payments to Fidelity or the lawyers or charges to members of the plaintiff class"; (Id.).

- "the New Invoice System [was] a database that, as the Court has explained, only contained tangential information." (Id. at 102).

- "the New Invoice System did not contain records of bills submitted to law firms or payments made by the law firms for technology or administrative services fees." (Id. at 101).

86.   As was subsequently revealed by the discovery conducted in Bigsby, these representations relied upon in the Court's May 2015 Opinion were false and/or fraudulent.

**N.  The Second Circuit Decision**

87.  The Fee-Split Class appealed the Court's determination refusing to grant a new trial on the Fee-Split Claims based on HomEq's failure to preserve the data showing payments to Fidelity.  In the appellate brief filed by M&E on HomEq's behalf, Defendants stated:

> At the heart of every argument made by Plaintiff is the charge of 'spoliation' of information from the NewInvoice System.   Judge Koeltl correctly determined that information from the allegedly 'spoliated' database (the NewInvoice System) would not have made any difference in the trial of this case.

(App. Index #15-2054, ECF Doc. #113, p. 9).

88.   HomEq's Appellate Brief contained pages of quotations from this Court's opinion, in which this Court relied on the misrepresentations made by HomEq and its attorneys on the Fee-Split issue, including:

- "The New Invoice system continues to exist, but it is currently difficult to access.  Buechner Aff. ¶15" (Id. at p. 20);

- The New Invoice system "does not contain records of bills submitted to law firms or payments made by the law firms for technology or administrative service fees.  Hymer Decl. ¶¶3-4 Those records are maintained on a separate internal computer system to which the defendants did not have access. Hymer Decl. ¶5"  (Id. at pp. 20-21);

- evidence of payments from attorneys to Fidelity "would not have been contained in the New Invoice System.  (Id. at p. 12);

- the New Invoice system "only contained tangential information."  (Id. at pp. 11, 23).

89.   On July 15, 2016, the Second Circuit affirmed the refusal to grant a new trial to the Split Fee Class.

90.   In a Summary Order, the Second Circuit found that the trial court did not abuse its discretion in declining to allow the Split Fee Class to raise the issue of spoliation to the jury despite the Court's finding that HomEq had acted willfully and with gross negligence in failing to preserve their databases.  The Court relied on the representations made by HomEq below in making the following findings to support its determination:

> The New Invoice System contained only 'tangential information' as to the fee-splitting claim: It did not record payment of invoices by defendants, it did not record fees that were charged to members of the class, and it did not contain bills by Fidelity to law firms or payments by law firms to Fidelity.

Mazzei v. Money Store, 656 Fed. App'x 558, 559 (2d Cir. 2016).

91.  As was subsequently revealed by the discovery conducted in the Bigsby case, the representations made by HomEq and its attorneys which were relied upon in the Second Circuit's Opinion were false and fraudulent, because they created the false impression that the Fidelity Payment Data could not have been produced by HomEq if it had complied with the Court's numerous orders to take steps to determine whether the Fee-Split Data in the possession of Fidelity's successors was retrievable.

92.  On December 23, 2016, Plaintiffs filed a Petition for writ of certiorari to the Supreme Court.  On March 20, 2017, the Supreme Court denied the Petition for Writ of Certiorari.

## II. PROOF OF FRAUD ON THE COURT WITH REGARD TO THE FEE SPLIT DATA IS UNCOVERED IN BIGSBY

93.  In 2014, several borrowers instituted the Bigsby Action against Barclays – the entity which purchased the HomEq servicing operation from Defendants in 2006 – alleging, among other things, that Barclays charged borrowers for purported fees which were improperly split with Fidelity.

See Bigsby v. Barclays, 14-cv-01398 (S.D.N.Y. 2014).

94. After years of motion practice directed at the pleadings, discovery in Bigsby did not begin in earnest until the summer of 2018. Just as in Mazzei, efforts to get Barclays to produce information relating to HomEq's business relationship with Fidelity were largely unavailing. Barclays did not produce any of its outsourcing agreements with Fidelity, or a single document relating to Fidelity's services, its compensation, or the Fidelity invoicing databases.  Moreover, when the Bigsby plaintiffs served a Rule 30(b)(6) deposition notice on Barclays seeking such testimony, Barclays refused to produce a witness to testify on these issues, requiring the Bigsby plaintiffs to file two motions to compel in October and December 2018.  (Bigsby, ECF Doc. #150; ECF Doc. #156).  Though the pendency of these motions finally caused Barclays to agree in theory to produce a Rule 30(b)(6) witness with knowledge about the HomEq-Fidelity business relationship – including the Fidelity databases – that ultimately did not happen.  Karen Stacy, the Rule 30(b)(6) witness produced by Barclays on February 28 and March 1, 2019, had never seen the Fidelity databases, and knew nothing about them.

95. The Bigsby plaintiffs' efforts to obtain discovery from Fidelity's successors about the Fidelity Databases met similar resistance.

Thus, when the Bigsby plaintiffs served subpoenas seeking documents relating to the Fidelity computer systems on the successors to Fidelity -- Black Knight Financial Services ("Black Knight") and ServiceLink Process Solutions ("ServiceLink") – those entities objected to any production, and moved to quash the subpoenas in federal court in Jacksonville in October 2018. The Bigsby plaintiffs successfully resisted this motion, yet neither Black Knight nor ServiceLink produced a single document relating to the computer systems provided to HomEq, claiming that none could be located.

96.   When the Bigsby plaintiffs served deposition subpoenas on Black Knight and ServiceLink, they were similarly met with wholesale objections. Even after several months of negotiation, Black Knight and ServiceLink insisted that plaintiffs "agree to defray the cost of research necessary to properly produce witnesses capable of testifying." (Letter dated Jan. 29, 2019 from Fred Goldberg to Bigsby plaintiffs' attorney). This impasse led to a second round of litigation, with Black Knight filing a motion to quash in Florida on February 6, 2019, and ServiceLink filing a similar motion to quash in federal court in Pennsylvania on February 8th. (See Bigsby v. Barclays, 3:18-cm-0034-TJC-PDB (M.D. Fla. Feb. 6, 2019); Bigsby v. Barclays, 2:05-mc-2025 (W.D. Pa. Feb. 8, 2019).

97.   However, with plaintiffs poised to file their opposition papers along with cross-motions to compel, Black Knight and ServiceLink finally agreed to withdraw their motions, search for responsive documents,[8] and produce deposition witnesses without demanding compensation from plaintiffs.

98..   As a result, in May 2019, facts emerged through discovery received from Black Knight and ServiceLink in the Bigsby Action which demonstrated that HomEq and its attorneys in <u>Mazzei</u> made numerous false representations relating to:

> (i)    HomEq's effort to preserve information relating to payments made by attorneys and Defendants to Fidelity;
>
> (ii)    the functionality and information contained on the Fidelity computer systems used by HomEq; and
>
> (iii)    the accessibility and retrievability of the Fee-Splitting Data HomEq was ordered to produce before the <u>Mazzei</u> trial.

## A. HomEq And Its' Attorneys Falsely Represented to the Mazzei Court in 2009 that HomEq Told Them That a Litigation Hold Was in Place

99.   On May 22, 2019, Black Knight finally produced a witness to

---

[8] As stated above, no instruction manuals or other documents relating to the Fidelity computer systems used by HomEq were ever produced by Black Knight or ServiceLink.

testify about Fidelity's relationship with HomEq.  That witness – a Vice President at Black Knight, Inc. named Caroline Bolen – testified that there was no evidence in Fidelity's records that any HomEq entity ever requested that the data on the Invoice Management system be backed up or saved by Fidelity.  (See excerpts from the Bolen Deposition Transcript (hereinafter "Bolen Tr.") annexed as Ex. A hereto, at 43:4-10).  This is directly contrary to the repeated representations made to this Court by HomEq and their counsel in Mazzei that they put a litigation hold in place on the Fidelity Payment Data.  (See ¶¶16, 49, supra).

100. Moreover, in papers filed in the Bigsby Action on May 10, 2018, Barclays represented that  (i) "The Money Store and TMS Mortgage, Inc. were merged into HomEq Servicing Corporation effective November 1, 2000"; and (ii) HomEq Servicing Corporation was "merged out of existence" after November 2006.  (Bigsby, ECF Doc. #23-1, p. 1, n.1).  Thus, since neither Money Store nor HomEq Servicing Corp. were even in existence in 2009, these representations demonstrate that HomEq and its attorneys were not telling the truth in Mazzei when – in opposition to the 2009 sanction's motion --  HomEq's law firm repeatedly represented to the Court that they had been "advised" and "assured" by "Money Store" that there was a litigation hold in place which protected the Fee-Split data from

destruction.  (See ¶¶16-17, supra).

### B. HomEq And Its' Attorneys Falsely Represented to the Mazzei Court that They Never Had Access to Any of the Data Systems Showing Payments To Fidelity

101.   During Black Knight's deposition, Ms. Bolen was shown a multipage document pertaining to "New Invoice" which, among other things, included hundreds of coded fees, including one labeled "Fidelity National Administrative fee."[9]  Ms. Bolen testified that she had no reason to believe that the "Fidelity National Administrative Fee" code did not relate to the type of administrative fees which were charged by Fidelity in connection with the Barclays serviced loans.  (Bolen Tr., at 115:10-116:9).

102.   Moreover, in answers to questions put forth by the attorney for Barclays, Ms. Bolen admitted that, as of May 2019, Black Knight had the ability to determine whether any of those coded fees were charged to borrowers on loans serviced by Barclays:

> Q.  Do you recall earlier today when Mr. Grobman was asking you questions about the various codes and descriptions that make up line items that could be selected by a vendor for invoices submitted to Invoice Management? [10]
> A.  Yes.

---

[9]   The New Invoice codes also included "TMS Outsource Management Fee" and "TMS-BK Outsource Recovery Fee."  "TMS" is an acronym for The Money Store, and TMS Mortgage Inc. was one of the Defendants in the Mazzei lawsuit.

[10] Invoice Management was the new name given to NewInvoice.

> Q.   And one of the specific line item descriptions you were asked about was something called a ***Fidelity National administrative fee***, is that right?
> A.  That's correct.
> Q.   And do you have the ***capability today*** to look up or have someone look up a particular borrower to see all of the line item descriptions that appeared on invoices submitted through Invoice Management for that particular borrower?
> A.  **Yes**.

Bolen Dep., pp. 188:11-189:2 (emphasis added).

103.   Indeed, Ms. Bolen further testified that Black Knight had the ability to specifically determine whether a fee with the code *"Fidelity National administrative fee"* or *"administrative fee"* appeared on invoices submitted through the Invoice Management system used by Barclays from 2006 to 2010:

> Q.  Did you do that [see which coded charges were included] for the five borrowers who are named Plaintiffs in this lawsuit?
> A.  I did do that.  I made the request.
> Q.   Okay.  And did the line item description ***Fidelity National administrative fee*** appear in the records for any of the five borrowers who are named Plaintiffs in this lawsuit?
> A.   They did not.
> Q.   Did any line item that had a description using the phrase ***administrative fee*** appear in the records for any of the five borrowers who are named Plaintiffs in this lawsuit?

A. I did not see any.[11]

Bolen Tr. at 189:3-15 (emphasis added).[12]

104.  Thus, Black Knight's testimony that – in May 2019 – it had the ready ability to extract data from the database used by HomEq Servicing to show each of the coded fees assessed on attorney invoices  -- including so-called "administrative fees" paid to Fidelity – is directly contrary to the repeated representations made by HomEq and their attorneys in the <u>Mazzei</u> action that:

> (i) payments to Fidelity for Administrative Fees were not on any database accessible to HomEq;

---

[11] As Ms. Bolen testified on redirect, her testimony that there were no Administrative Fees charged in connections with the Bigsby Plaintiffs' loans was incorrect, as Black Knight's records did show that such fees were paid in the foreclosures and bankruptcies relating to those loans. (Bolen Tr., at 191:19-193:6).

[12] Moreover, in its objections to a subpoena served by the Bigsby Plaintiffs in February 2019, Black Knight said the following:

> Administrative Fees were not generated through MSP but rather resulted from the operation of separate software known as Process Management.

(Black Knight's Response and Objections to Document Request, p. 10; ServiceLink's Response and Objections to Document Request, p. 7 (same)) Barclays (and HomEq) had access to Process Management, which was part of a suite of products provided to them by Fidelity.  (Bolen Transcript, p. 86-87, 109).

(ii) the Fidelity Payment Data could not be retrieved unless "either the original New Invoice system [was] resurrected or new software w[as] designed to read the data," (¶59, supra); and

(iii) HomEq did not have the ability to obtain the Fidelity Payment Data from the successors to Fidelity without extraordinary burden and expense.  (¶¶44, 47, 61, 88 supra).

105.   Ms. Bolen also testified that the billing of technology fees charged by Fidelity for Invoice Management was billed through (and could be reviewed on) Invoice Management, one of the systems licensed to HomEq by Fidelity.  (Bolen Tr., 83:16-20).  Again, this is directly contrary to the representations made by HomEq in Mazzei and relied upon by the Court in finding that records of Technology Fees were "maintained on a separate internal [Fidelity] computer system to which the Defendants did not have access."  (See ¶¶52, 66 supra).

### C.   HomEq and Its Counsel Falsely Represented to the Mazzei Court that They Had No Ability to Obtain Information About the Payments To Fidelity

106.   As indicated by a letter from its counsel, on May 13, 2019, Black Knight and ServiceLink produced a document listing all revenues received by Fidelity (i) "from Network Firms for Administrative Fees in connection with all loans serviced by Barclays/HomEq on [Fidelity's] system for each year from 2006 through 2010"; and (ii) all "Invoice

Management technology fees" paid to Fidelity "related to Barclays/HomEq loans from 2006 through 2010." See letter annexed as Ex. B hereto.[13]

107.   Testifying about these documents, Ms. Bolen acknowledged that Black Knight had the ability to break out Administrative Fees that were charged to particular clients by predecessor entities such as Fidelity and LPS.  In fact, Ms. Bolen testified that she obtained the summary of Administrative Fees charged on Barclays matters described in Paragraph 106 above from Black Knight's accounting department, which had a database which contained records of all such fees.  (Bolen Tr. at 79:2-80:1, 99:11-16; see generally 78-82).   Ms. Bolen testified that she had no problem obtaining the Administrative Fee data, receiving it within a few days after requesting the accounting department to provide it.  (Id. at 78:5-13).  This is directly contrary to the representations made by HomEq and its counsel in the Mazzei action from 2013 through 2016 that HomEq had no ability to obtain the Fidelity Payment Data from Fidelity or its successor entities without recreating the Fidelity database, an undertaking which it said would require extraordinary time and expense.  (See ¶¶44, 47, 59, 61, 88, supra).

---

[13] Because Black Knight claims that the information in these documents is confidential, Plaintiffs are unable to append a copy of the document showing the Administrative Fees and Technology Fees to this pleading.

108.  Ms. Bolen also testified that Black Knight had the ability to break out Technology Fees that were charged to particular clients by Fidelity and LPS.  (Bolen Tr., pp. 56:12- 59:4).  Bolen obtained the summary of Technology Fees charged on Barclays matters described in Paragraph 106 above from Black Knight's accounting department, which had a database containing records of all such Technology Fees.  (Id. at 58:8-11).  Ms. Bolen testified that she had no problem obtaining such data from Black Knight's accounting department, receiving the data approximately a week after requesting it.  (Id. at 59:9-15; 65:22-66:19).  As with Administrative Fees, Black Knight's ability to provide this information is directly contrary to the numerous representations made by HomEq and its counsel in the Mazzei action that Defendants had no ability to obtain data relating to Technology Fees from Fidelity or its successor entities without extraordinary effort and expense.  (See ¶¶44, 47, 59, 61, 88, supra).

D.  **HomEq and Its Counsel Falsely Represented to the Mazzei Court that Data on New Invoice Could Not Be Downloaded**

109.  Ms. Bolen also testified that numerous reports could be created on Invoice Management using the coded fees and expenses incorporated into the system, and that those reports could be saved in a variety of ways, including by printing them or saving them onto an Excel Spreadsheet.

(Bolen Tr. at pp. 137-38).  This is directly contrary to the representations made by HomEq and its attorneys in the <u>Mazzei</u> litigation, who repeatedly represented that the information on Invoice Management and New Invoice could not be saved or downloaded.  (See ¶¶37,49, 54, 57, supra).

### E. HomEq and Its Counsel Falsely Represented to the <u>Mazzei</u> Court that New Invoice Did Not Show The Payment of Invoices

110.  Ms. Bolen also testified that the "Check Confirmed" field on invoices issued on Invoice Management indicated whether the amounts invoiced were paid:

> Q.  And what does 'check confirmed' mean?
> A.  Check confirmed means Invoice Management that there was a payment that was mailed for that invoice.
> Q.  So 'check confirmed' means paid?
> A.  Correct.
> Q.  And if there is no date in check confirmed, what does it mean?
> A.  It was not paid.

(Id. at 149:15-150:1).

111.  This is contrary to the representations made by HomEq and its counsel in the <u>Mazzei</u> Action, where they repeatedly stated that the Fidelity invoicing system used by HomEq did not reflect whether the fees charged to HomEq and ultimately passed on to borrowers – including administrative fees paid to Fidelity – were in fact paid.  (See ¶¶45, 54, 80 supra).

II.   **THE MISREPRESENTATIONS TO THE COURT IN THE MAZZEI ACTION WERE HIGHLY MATERIAL, AND WERE REPEATEDLY RELIED UPON IN BOTH THE DISTRICT COURT AND SECOND CIRCUIT DECISIONS**

112.  In sum, as shown above, the evidence obtained in the <u>Bigsby</u> Action demonstrates that – from at least 2009 through the trial and appeal of the Mazzei Action in 2016 – HomEq and both its in-house and retained attorneys engaged in a series of false representations which prevented the Fee-Split Class from obtaining critical evidence showing the payments to Fidelity on legal matters referred to lawyers by HomEq.

113. When Mr. Mazzei first moved to enjoin HomEq from purging the Fee-Split data during discovery in 2009, HomEq and its attorneys Pollack & Kaminsky falsely represented that HomEq had preserved data showing the payment of fees to Fidelity on their data systems.

114. Then, when the Fee-Split Class asked HomEq to provide the payment data after the Fee-Split Class was certified by this Court, HomEq, its new attorneys at M&E and its in-house attorney Mark Buechner falsely represented that (i) information regarding payments to Fidelity for the services provided to HomEq was never on the databases which HomEq licensed from Fidelity; (ii) even if it had been on those databases, the Fidelity Payment Data could not be downloaded or otherwise saved; and

50

(iii) the payment data in the possession of Fidelity's successors was inaccessible, and could only be made readable by the prohibitively expensive task of recreating the databases.

115.  The Fidelity Payment Data was critical to the Fee-Split Class's effort to demonstrate HomEq's liability at the trial of the Mazzei action, and the Court repeatedly relied on the representations made by HomEq and its attorneys in making its pretrial determinations relating to sanctions and the evidence which could be presented to the jury.  The Second Circuit likewise relied on these representations in its opinion affirming this Court's rulings.

116.  Moreover, HomEq relied almost exclusively on the absence of evidence of payments from lawyers to Fidelity in its defense to the Fee-Split Class's claims.  Indeed, the Court held that the absence of evidence of payment was one of the bases on which the jury could have determined that the Fee-Split Class had failed to prove its claim.

117.  In addition, HomEq was also subject to numerous Court orders to produce the Fidelity Payment Data and/or take whatever steps were necessary to determine whether that data could be put into accessible form. (See Orders referred to in ¶¶29-31, 43, 70, supra).  Given the information revealed in Bigsby, it is clear that – even after it had already been

sanctioned for acting willfully and with gross negligence" – HomEq willfully failed to comply with these orders.

118.   In fact, Plaintiffs respectfully submit that HomEq's failure to produce the Fidelity Payment Data after already having been sanctioned for acting willfully and with gross negligence would fully warrant the most serious sanctions under FRCP Rule 37, including vacating the judgment and striking the Answer, if plaintiffs sought those remedies.   As the Second Circuit has repeatedly held, a party's compliance with discovery orders "is necessary to the integrity of our judicial process.  A party who flouts such orders does so at his peril."  Update Art Inc. v. Modiin Pub. Corp., 843 F.2d 67, 73 (2d Cir. 1988).  Or put another way by  Justice Neil Gorsuch when he was on the Tenth Circuit: "Three strikes is more than enough to allow the district court to call a litigant out."  Lee v. Max Int'l, 638 F.3d 1318, 1321 (10th Cir. 2011) (affirming dismissal for a party's repeated failure to comply with discovery order).[14]

---

[14] See also  Cine Forty-Second Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979) (in which the Second Circuit found that the preclusion of evidence tantamount to dismissal is appropriate where a party was grossly negligent in failing to comply with a disclosure order (even though it ultimately produced the information), finding that case dispositive sanctions are necessary if "Rule 37 is to be perceived as a credible deterrent rather than a "paper tiger").

IV. **HOMEQ CONTINUES TO RELY UPON THE MISREPRESENTATIONS MADE IN MAZZEI IN COURT FILINGS IN OTHER CASES**

119.   Finally, sanctions are especially appropriate in this case because HomEq and Fidelity's successors *continue* to rely upon the misrepresentations made in the <u>Mazzei</u> Action in other recent federal court filings.  Thus, in a brief filed with the Ninth Circuit on December 20, 2019, HomEq again cited to statements made in <u>Mazzei</u> by in-house attorney Mark Buechner to represent that, after HomEq's servicing business closed in 2010, "data on the New Invoice System was reduced to raw data, which made it difficult to access information."  (Appellee's Answering Brief in <u>Piatt v. Money Store</u>, 19-55780, ECF Doc. #14, pp. 5-6).  HomEq's Ninth Circuit brief goes on to state that "[t]he <u>Mazzei</u> Court ultimately held that Mr. Mazzei was not entitled to any evidentiary remedy at trial because the New Invoice System did not contain relevant information…"  (Id. at p. 6).

120.   Counsel for Black Knight has made similar misrepresentations in papers recently filed in <u>Bigsby v. Barclays</u>, 14-cv-1398 (S.D.N.Y. 2014).   Thus, on February 14, 2020, Black Knight filed papers in opposition to a Motion for Clarification on the Scope of the Protective Order in Bigsby.  Black Knight's papers included two Declarations from attorneys: one from Fred Goldberg, who represented LPS and Black

Knight as outside counsel with regard to the subpoenas in the <u>Mazzei</u> and <u>Bigsby</u> actions; and the second from Rodolfo Rivera, who identified himself as in-house counsel for Black Knight from 2014 to the present. (See Goldberg Declaration filed on Feb. 14, 2020, ECF Doc. #262; Rivera Declaration filed on Feb. 14, 2020, ECF Doc. #221).

121.  In his Declaration, Mr. Goldberg again represented that there would be "considerable expense" involved in "attempting to extract readable information from the compressed, raw data not readily subject to retrieval that might be responsive to the Mazzei subpoena."  (ECF Doc. #262, p. 3, ¶8).

122.  In his Declaration, Mr. Rivera – Black Knight's in-house counsel since 2014 – stated that:

> I have reviewed Mr. Goldberg's September 11, 2013 letter to Mazzei's counsel, and the narrative therein was and is accurate.  However, the stored data regarding HomEq loans was not segregated from the data of other, unrelated clients.  With a substantial investment in time and personnel, the HomEq data could be extracted as to individual loans, formatted for presentation in a readable form for production.  It was possible, but not certain, that the information requested by Mazzei could be extracted in bulk at significant expense.

(ECF Doc. #261, p. 2, ¶5).

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Mazzei and the Fee Split Class respectfully

requests relief against HomEq as follows:

(a)  that this Court find the Defendants committed fraud on the court in the Mazzei Action under FRCP Rule 60(d)(3), and award the attorneys' fees and expenses incurred by the Plaintiffs in that action;

(b)  that this Court find the Defendants violated numerous disclosure orders in the Mazzei Action, and award the attorneys' fees and expenses incurred by the Plaintiffs in that action under FRCP Rule 37;

(c)  that this Court award the attorneys' fees and expenses incurred in uncovering the evidence which is the basis for this proceeding; and

(d)  that this Court award such other and further relief as the Court deems just and proper.

Dated: May 13, 2020

PAUL GROBMAN, ESQ.
BY:__//Paul Grobman//_____
Paul S. Grobman (PG 1876)

THE LAW OFFICES OF PAUL GROBMAN
555 Fifth Avenue, 17th Floor

New York, N Y 10017
212 983-5880


GITLIN, HORN AND
VAN DE KIEFT LLP


/s/ Moshe Horn

Moshe Horn
Christopher M. Van de Kieft
2095 Broadway, Suite 411
New York, New York 10023
212-514-5437
mhorn@ghvlaw.com
cvandekieft@ghvlaw.com

Attorneys on behalf of Mazzei and
the Fee Split Class